**LODGED**
CLERK, U.S. DISTRICT COURT
04/10/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
4/10/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___D.C.___ DEPUTY

UNITED STATES OF AMERICA,

v.

CARLOS EMILIO NORIEGA OLIVAS,

Defendant.

Case No. 5:25-mj-00190

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on April 8, 2025, in the county of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | See attached affidavit. |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Pursuant to Fed. R. Crim. P. 4.1
_____
*Complainant's signature*

HSI Special Agent, Timothy Pike
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   4/10/25

_____
*Judge's signature*

City and state:   Riverside, California

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Sean D. Peterson (951-276-6930)

## **AFFIDAVIT**

I, Timothy Pike, being duly sworn, declare and state as follows:

### I. **INTRODUCTION**

1. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI"), and have been so employed since November 2022. I am currently assigned to the HSI Office of the Assistant Special Agent in Charge in Riverside, California, part of HSI Office of Special Agent in Charge Los Angeles. My duties as a HSI SA included apprehension, or detention of, individuals suspected or convicted of offenses against the laws of the United States, and conducting investigations into violations of federal laws, which includes, but not limited to, Title 8-Immigration, 19-Customs, 21-Controlled Substances, 18-General, and other laws relating to the Homeland Security Act of 2002 and the Maritime Drug Law Enforcement Act. Through my training, I have learned of HSI's criminal investigative authority, as well as investigative techniques. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Central District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers. I have assisted in the execution of search warrants to seized evidence of violations of federal and state law to apprehend individuals who have committed such

violations. I am familiar with how drug traffickers, exporters, and smugglers use digital devices and international mail to facilitate and conceal their crimes.

2. Prior to working for HSI, from 2018 to 2022, I worked for the United States Customs and Border Protection as a United States Customs and Border Protection Officer ("CBPO"). As a CBPO, I received training on techniques, methodologies, and operational habits of narcotics trafficking organizations. I have successfully conducted operations to mitigate the elicit movement of people, merchandise, and contraband contrary to law.

## II. **PURPOSE OF AFFIDAVIT**

3. This affidavit is made in support of a criminal complaint against Carlos Emilio NORIEGA OLIVAS ("OLIVAS") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute at Least 500 Grams of a Mixture or Substance Containing a Detectable Amount of Methamphetamine. This affidavit is also made in support of a search warrant for two digital devices, a White Apple iPhone Pro, and White T-Mobile Android phone, in the custody of HSI in San Bernardino, California, as described in Attachment A, for the items to be seized described in Attachment B.

4. The facts set forth in this affidavit are based upon my personal observations, my review of investigative reports, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not

2

purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. PROPERTY TO BE SEARCHED

5. The property to be searched are two digital devices, a White Apple iPhone Pro, and White T-Mobile Android phone, in the custody of HSI in San Bernardino (the SUBJECT DEVICES) described in Attachment A, which is incorporated herein by reference.

### IV. ITEMS TO BE SEIZED

6. The items to be seized are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to possess with intent to distribute, and to distribute, controlled substances) (the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

### V. SUMMARY OF PROBABLE CAUSE

7. On April 8, 2025, OLIVAS was stopped by the United States Border Patrol driving on the Interstate 15 northbound near Murrieta, California, a few hours after he crossed into the United States from Mexico. Border Patrol Agents ("BPAs") found approximately 345.2 gross kilograms of liquid methamphetamine concealed within non-factory compartments inside the driver's

3

side and passenger's side gas tanks and the SUBJECT DEVICES in the vehicle.

## VI. STATEMENT OF PROBABLE CAUSE

### A. Border Patrol Stop

8.  On April 8, 2025, United States Border Patrol agents assigned to the Newton-Azrak Border Patrol Station ("MUR") were conducting targeted enforcement and anti-smuggling operations within the Newton-Azrak Border Patrol area of responsibility (AOR). Agents routinely conduct their enforcement activities along the Interstate 15 (I-15) smuggling corridor. This area is located approximately 70 miles from the United States/Mexico International Border and is a well-known and documented corridor used by illegal entrants and smugglers to transport their illicit cargo north into the interior of the United States.

9.  Border Patrol Agent ("BPA") Gilberto Contreras was operating a marked United States Border Patrol (BP) Chevrolet Tahoe (M98305) and was performing his duty in uniform clearly displaying his status as a law enforcement officer. BPA Contreras is familiar with the appearance and behavior of individuals involved in smuggling undocumented aliens and narcotics into the United States. BPA Contreras has received training that includes but is not limited to highway interdictions, behavioral analysis and interview techniques including detecting deceptions and eliciting responses. On April 8, 2025, at approximately 6:15 p.m., BPA Contreras was conducting records checks through DHS databases on vehicles traveling northbound along the Interstate 15 freeway when he

4

observed a semi-truck with Baja California license plates (89-ER-8L) (hereinafter referred to as V-1). Records checks revealed two subjects; Carlos Emilio NORIEGA OLIVAS ("OLIVAS") and Jesus Rigoberto MENDEZ ("MENDEZ") were associated to V-1 and both OLIVAS and MENDEZ were associated with narcotics trafficking within DHS databases. BPA Contreras noted that V-1 entered the United States from Mexico via the Tecate Port of Entry at approximately 3:43 p.m. with no trailer attached to V-1. Based on the border crossing history of V-1 between August 26, 2024 and April 8, 2025, BPA Contreras noticed V-1 usually entered the United States without a trailer attached. From observing V-1, BPA Contreras also noticed that the fifth wheel coupling on V-1 displayed no signs of recent use as it was dirty and dry. BPA Contreras was a truck driver prior to becoming a BPA and knows that a semi-truck traveling without cargo is very unusual because money is made when cargo is transported, not the lack thereof.

10. BPA Contreras was unable to catch up to V-1 on the Interstate 15 freeway because he was too far behind it after conducting records checks. Instead of continuing to pursue V-1, BPA Contreras performed further records checks, which revealed that V-1 traveled west on State Route 94, passing through the Border Patrol Brownfield Checkpoint. Based on his experience, BPA Contreras believes taking that route is unusual because most semi-trucks that have crossed the border typically take the Interstate 8 Freeway to merge on the Interstate 15 freeway. Based on V-1's time of entry (3:43 p.m.) into the United States

from Mexico, BPA Contreras believes V-1 was traveling for over two hours since crossing into the United States from Mexico. I know that is takes less than two hours to drive from the Tecate Port of Entry to the area which BPA Contreras was working at this time. Due to the time of day, there was traffic congestion on the Interstate 15 freeway northbound. At approximately 6:17 p.m., BPA Contreras contacted BPA Erick Emiliano to share the information he discovered regarding the records checks of V-1 and he shared the physical description of V-1.

11.  At approximately 6:20 p.m., BPA Emiliano and his partner, Canine Teo (#230582) were operating in an unmarked U.S. Border Patrol (BP) Ford F-150 canine truck, both trained and certified in the detection of concealed humans, narcotics, and narcotics derivatives.  BPA Emiliano was roving on the Interstate 15 northbound freeway near Fallbrook, California when his partner, BPA Contreras, advised over the radio that he observed V-1 traveling northbound on the Interstate 15 freeway. BPA Contreras told BPA Emiliano that V-1 had narcotics-related lookouts in DHS databases regarding the smuggling of liquid methamphetamine. Subsequently, BPA Emiliano observed V-1 approaching near his position. BPA Emiliano noticed V-1 circumvent the open California Highway Patrol ("CHP") truck scales when no other semi-trucks were circumventing the truck scales at that time. In BPA Emiliano's experience, it is very unusual for semi-trucks to circumvent the "CHP" truck scales while they're operational. BPA Emiliano then pulled up next to V-1, with the windows of his unmarked unit rolled down,

6

revealing his full United States Border Patrol uniform, agency issued vest, and cage concealing the canine within, and revealing the large antennae fixed on the outside of the unmarked unit, revealing himself as law enforcement. BPA Emiliano then started following behind V-1 again and immediately observed V-1 make an unnecessary lane change from lane three to lane four after which V-1 appeared to speed up. BPA Emiliano believed this was an attempt to create distance from his unmarked unit. BPA Emiliano continued to follow V-1 while going northbound on the Interstate 15 freeway and observed V-1 conduct two more unnecessary lane changes before BPA Emiliano drove his unmarked unit directly behind V-1.

    12.  BPA Emiliano observed no trailer attached to V-1, which he found unusual. Through the BPA's experience, he understands that it is not cost efficient to travel with no trailer any great distance. The fifth wheel coupling also displayed no signs of recent use as it was dirty and dry. BPA Emiliano knows that it is common practice for semi-trucks to maintain grease on the fifth wheel for proper attachment to a trailer.

    13.  While following V-1, BPA Emiliano then conducted record checks on his DHS issued laptop and confirmed V-1 was identified as associated with controlled substance trafficking within DHS databases on the license plate. BPA Emiliano noticed V-1 also had approximately an hour and twenty-minute delayed travel time from the U.S./Mexico border in addition to common

travel time from the Tecate Port of Entry to the location in which V-1 was observed.

14.  Due to record checks, driving behavior, and delayed travel time from the U.S./Mexico border, BPA Emiliano decided to conduct a vehicle stop for further investigation. The BPA advised San Diego County Dispatch he would be conducting a vehicle stop on V-1 at approximately 6:40 p.m. The BPA activated his emergency overhead lights, and V-1 yielded near the Murrieta Hot Springs offramp near Murrieta, California.

15.  BPA Emiliano approached the passenger side of the vehicle and identified himself as a Border Patrol Agent to the subject, who was later identified as Carlos Emilio NORIEGA OLIVAS ("OLIVAS"). The BPA asked OLIVAS for identification, after which OLIVAS provided BPA Emiliano with a United States Visa Border Crossing Card (TJT111228700).

16.  During initial conversation with OLIVAS, he told BPA Emiliano he did not cross V-1 through the port of entry and that he did not know whom V-1 belonged to. BPA Emiliano knows this is a tactic called a "driver swap" which is when an individual crosses a vehicle through the international border and once in the United States, the vehicle is handed over to another driver for that second driver to drive the vehicle while in the United States. This tactic is commonly used by Drug Trafficking Organization ("DTOs"). OLIVAS stated to the BPA that "Rigoberto" asked him to pick up an empty trailer in Fontana to take it back to Mexico. BPA Emiliano knows through training and experience that it's unusual for a semi-truck driver to travel into the

8

United States without cargo and pick-up an empty trailer to deliver it back to Mexico. BPA Emiliano knows that would be inefficient for a truck driver to travel round trip without cargo. OLIVAS also told BPA Emiliano that he did not have the address to where the empty trailer was located and that he would receive a new location to drive to, once he arrived in Fontana, California. BPA Emiliano conducted additional records checks on OLIVAS, which revealed additional narcotics-related lookouts on him. Records checks also revealed V-1's company had no ownership, it was a one fleet LLC with a P.O. Box address in San Luis, Arizona. BPA Emiliano believes that is consistent with smuggling tactics used by Transnational Criminal Organization ("TCOs"). During his conversation with OLIVAS, BPA Emiliano observed through the open passenger's side door, a California license plate (9G1568) on the floor of V-1. Records checks of the California license plate revealed that a different vehicle crossed the international border with that license plate on the same day. I know through training and experience that using the same license plates on different vehicles is an additional tactic used by DTOs and TCOs in an attempt to evade law enforcement detection at the port of entry.

17. Due to the implausible travel story, lack of knowledge on his travel and ownership of V-1, BPA Emiliano asked OLIVAS for consent to conduct a canine sniff and search of the inside and outside of V-1. OLIVAS granted consent. BPA Emiliano also told OLIVAS he and his canine partner are trained and certified in the detection of concealed humans and the odors of marijuana,

cocaine, heroin, methamphetamine, their respective derivatives and ecstasy. BPA Emiliano asked OLIVAS if he was responsible for everything in V-1 and OLIVAS told him he was responsible for everything within V-1.

18. BPA Emiliano retrieved his canine partner Teo, who conducted an open-air sniff of the outside of V-1. Canine Teo immediately alerted to the presence of narcotics near the driver's side gas tank. Canine Teo then alerted to the passenger's side gas tank. BPA Emiliano concluded he did not possess the equipment to properly conduct a proper field test on the fuel within the gas tank. BPA Emiliano observed unusual welding and a potential non-factory compartment within the fuel tank while utilizing a fiber optic scope. Due to the implausible story, records checks on V-1 and OLIVAS, and anomalies observed within the fuel tank of V-1, it was decided to transport V-1 to "MUR" for overnight hold, due to the lack of assets to access the potential non-factory compartment within the fuel tank. OLIVAS and V-1 were transported to "MUR" at approximately 9:13 p.m.

  **B. Phone Call Received By Border Patrol**

19. On April 8, 2025, BPA Keith Miller was assigned to MUR as a roving patrol unit. At approximately 6:45 p.m., BPA Miller was inside the Interstate 15 checkpoint building located south of Temecula, California. BPA Miller was aware of the traffic stop being conducted by BPA Emiliano. Between the hours of 7:30 p.m. and 8:30 p.m., while the traffic stop was being conducted by BPA Emiliano, BPA Miller received a phone call at the

checkpoint building. The person on the phone told BPA Miller they were a trucking company, and they were looking for a semi-truck that had been stopped. They told BPA Miller their driver failed a "drug test" on the side of the road and was unable to drive the vehicle. The person stated they would need the location of the truck so they could pick it up. BPA Miller informed the caller the Border patrol does not give drug tests on the side of the road and if there was an issue with sobriety and a truck driver, he would contact "CHP" Truck Scales. The caller stated she had contacted the "CHP" Truck Scales, and they told her to call BPA Miller. BPA Miller repeated they do not conduct sobriety tests on vehicle stops. BPA Miller also told the caller he would not be allowed to share personal information of anyone they encountered, stopped, or arrested, over the phone. The caller became persistent to get the location of any semi-truck that had been stopped, not just V-1. BPA Miller told her again he could not confirm, deny or give out any information and terminated the phone call. The caller utilized telephone number (909) 265-0251 and is associated to a company called "Quadrant Transportation" out of San Bernardino, California. In my training and experience, DTOs use "Scouts" to follow high value, narcotic-laden vehicles to ensure they are not stolen or to report if they are stopped by law enforcement. I believe V-1 was being followed by "Scouts" from the DTO because of the value of the potential narcotics to be concealed within.

**C.    Search of Vehicle**

20.    On April 9, 2025, at approximately 8:04 a.m. BPA Luis Lopez drilled a hole into the passenger's side gas tank, visually confirming a portion of the non-factory compartment within the fuel tank. BPA Manuel Rivera then retrieved a small sample of the light brown liquid from the drill to field test with the Tru Narc machine. The light brown liquid retrieved from the non-factory compartment tested positive for properties consistent with methamphetamine. Homeland Security Investigations (HSI) office of the Assistant Special Agent in Charge (ASAC) Riverside responded to take over the investigation. Special Agent (SA) Timothy Pike, SA Fahd Farouh and Task Force Officers (TFO) Carlos Fregoso and Jorge Casas of HSI Riverside's Inland Empire Border Enforcement Security Taskforce (IE BEST) responded to MUR.

21.    At approximately 11:00 a.m. Apple Towing Services responded to "MUR" to retrieve the potential narcotics from gas tanks of V-1. The contractors of Apple Towing Services cut open the gas tanks of V-1, which revealed a non-factory compartment concealed within both gas tanks. The contractors syphoned the diesel fuel from the gas tanks to ensure there was no mixture of fuel and the potential narcotics within the non-factory compartments. The contractors then syphoned the liquid from the non-factory compartments within the gas tanks, which was tested with a narcotics field test kit. The liquid within the non-factory compartments of both gas tanks tested positive for properties consistent with methamphetamine.

22. A total of approximately 345.2 gross kilograms of a liquid substance field which tested positive for the presence of methamphetamine was retrieved from the non-factory compartments within the driver's side and passenger's side gas tanks of V-1.

**D. Cellular Telephones**

23. The SUBJECT DEVICES were observed by BPA Emiliano during the traffic stop. One SUBJECT DEVICE was mounted to the dashboard of V-1, within hands reach and easily accessible while driving. The second SUBJECT DEVICE was seen placed within what BPA Emiliano believes to be a cupholder in front of OLIVAS, also easily accessible while driving V-1. BPA Emiliano advised OLIVAS received a phone call on the SUBJECT DEVICE that was mounted on the dashboard, during the traffic stop. OLIVAS answered and put the phone call on speaker. OLIVAS spoke to the unidentified caller, who OLIVAS referred to as "a mechanic." BPA Emiliano stated he couldn't understand exactly what was said during the brief phone call because OLIVAS was speaking the Spanish language in a way that BPA Emiliano couldn't understand. OLIVAS also grabbed one of the SUBJECT DEVICES and showed BPA Emiliano he was utilizing GPS to get to his destination in Fontana, California. I know that DTOs commonly use the term: "mechanics" as a person who retrieves narcotics from narcotic-laden vehicles or builds non-factory compartments within load vehicles.

**VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

24. As used herein, the term "digital device" includes the SUBJECT DEVICES.

25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, *inter alia*, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

14

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.   CONCLUSION

28. For all the reasons described above, there is probable cause to believe that Carlos Emilio NORIEGA OLIVAS ("OLIVAS") violated 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute at Least 500 Grams of a Mixture or Substance Containing a Detectable Amount of Methamphetamine.

29. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT DEVICES, as described in Attachment A.

/s/ Pursuant to Fed. R. Crim. P. 4.1
Timothy Pike, Special Agent
Homeland Security Investigations

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 10th day of
April, 2025.

HONORABLE SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE

16